# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 2:15-cr-00516-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| DAEWON WARREN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on defendant Daewon Warren's ("Warren") motion to suppress. For the reasons set forth below, the court denies the motion.

## I. BACKGROUND[1]

Warren was indicted on multiple counts, including sex trafficking by force, fraud, or coercion, sexual exploitation of children, and possessing child pornography. On October 17, 2017, Warren moved to suppress statements that he made to police officers before he was arrested on March 2, 2015, at the Motel 6 at 2551 Ashley Phosphate Road in North Charleston, South Carolina. Warren contends that he did not receive <u>Miranda</u> warnings prior to any statements he made, and so the statements should be suppressed. Specifically, Warren seeks to suppress statements about his hotel room number and that he was staying at the Motel 6 with "his girl." On October 18, 2017, the court held a hearing on Warren's motion to suppress. After the hearing, the court denied Warren's motion. This order supplements that previous ruling.

### 1. Questioning by Detective Ron Metrejean

---

[1] The court held a hearing on October 18, 2017, during which it heard testimony from Detectives Metrejean and Benton. Warren did not testify. The Background Section is drawn from this hearing testimony.

1

Detectives Ron Metrejean ("Detective Metrejean") and Charlie Benton ("Detective Benton") first responded to the Motel 6 in an unmarked police car. The detectives were at the Motel 6 on a tip that a "black male with cornrows in a bright shirt" driving a green BMW with paper tags was engaged in human trafficking of an underage black female. The tip initially said that the human trafficking was occurring in room 143.

While Detective Benton went to room 143 to determine if there was any evidence of trafficking, Detective Metrejean stopped Warren as a suspect matching the physical description in the tip. Detective Metrejean introduced himself to Warren as a detective with the North Charleston Police Department, and while he was not wearing his full police uniform during the questioning he was wearing a police vest and had his firearm visible. Detective Metrejean then engaged Warren in a "field interview contact routine," which included asking Warren where he was from, how long he had been staying in the hotel, and what hotel room he was staying in. Detective Metrejean testified that Warren appeared "very cooperative," did not seem "worried or concerned" and answered all of the questions calmly. Detective Metrejean at no point made any threats or promises to Warren. The questioning took place in front of a breezeway located in front of the Motel 6 office. The breezeway was an open space, where Warren could have walked backwards or sideways to leave the conversation. At some point during the time period when Detective Metrejean was questioning Warren, Detective Benton was visible as he was climbing down the stairs at the hotel breezeway to approach Warren.

### 2. Questioning by Detective Charlie Benton

During Detective Metrejean's questioning of Warren, Detective Benton joined the conversation to question Warren. This questioning also took place in front of the

breezeway of the Motel 6. A "few minutes" after Detective Metrojean started questioning Warren, at least one more police car—this one a marked police car—arrived on the scene, and uniformed police officers were standing "off to the side" in "close proximity" to the hotel breezeway where Detective Metrejean was questioning Warren. FBI Special Agent Ken Hawsey ("Agent Hawsey") was also on the scene, for a total of at least four law enforcement officers. At the point that Detective Benton questioned Warren, there were at least two officers—Detective Metrejean and Benton, with at least Detective Metrejean in a police vest—in Warren's immediate vicinity. Multiple other back-up officers, in full police clothes, as well as a marked police car, were in Warren's vicinity.

Detective Benton also questioned Warren in the hotel breezeway. After Benton asked Warren who he was, where he was staying at the hotel, and who he was staying with, Benton then made contact with the victim, after which Warren was arrested.

## II. DISCUSSION

Warren argues that the failure of Detectives Metrejean and Benton to provide him with Miranda warnings before questioning him in the hotel breezeway requires the exclusion of any statements he made. The government counters that Warren was not "in custody" at the time that he was questioned, and therefore that no Miranda violation occurred. The determination of whether there was a Miranda violation turns on whether the circumstances of Warren's questioning amounted to a custodial interrogation within the meaning of Miranda v. Arizona, 384 U.S. 436 (1966). The court finds that they do not, and thus denies Warren's motion to suppress.

The Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. When police officers place a defendant in custody, they must inform the defendant of his or her constitutional rights in order to counteract the "'inherently compelling pressures' of custodial interrogations and to 'permit a full opportunity to exercise the privilege against self incrimination.'" Arizona v. Robertson, 486 U.S. 675, 681 (1988) (quoting Miranda, 384 U.S. at 467). The Supreme Court laid out the test for whether an individual is "in custody" in Berkemer v. McCarty, 469 U.S. 420, 440 (1984):

> The operative question is whether, viewed objectively, a reasonable man in the suspect's position would have understood his situation to be one of custody. This determination is made by examining all of the circumstances surrounding the interrogation and determining how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.

Id. (internal citations omitted). An interrogation is defined for Miranda purposes as "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980). This determination of whether a suspect is "in custody" requires the court to examine all of the circumstances of the questioning, such as the location of the questioning, its duration, the statements made during the questioning, and presence or absence of physical restraints, and whether the suspect was released at the end of questioning. Berkemer v. McCarty, 468 U.S. 420, 437–38 (1984).

The analysis of whether Warren was "in custody" at the time that he was questioned by Detective Metrejean, and then by Detective Benton, is an inherently fact-specific inquiry. Now, there are certainly some facts to support a finding that Warren was "in custody." Namely, there were multiple officers present at the time that Warren was questioned. Courts have found the number of officers present as a factor to consider

when determining whether questioning was custodial. In United States v. Colonna, 511 F.3d 431 (4th Cir. 2007), the court found that interrogation was custodial where twenty-four armed FBI agents executed the initial search warrant on the defendant's home and then held him in isolation during his interrogation. Similarly, in United States v. Cavazos, 668 F.3d 190, 194 (5th Cir. 2012), the court held that a defendant who was awakened and handcuffed while "more than a dozen officers entered and searched the home" was in custody. In United States v. Craighead, 539 F.3d 1073, 1089 (9th Cir. 2008), a FBI special agent escorted the defendant to a room that was guarded by another armed detective while six officers searched the house. Under those circumstances, the Craighead court found that while the defendant was told that he was "free to leave," under the totality of the circumstances the defendant was "in custody" for Miranda purposes. Id. Here, there were two officers at the scene of the motel visible to Warren when Detective Metrejean first approached Warren—Detective Metrejean was directly talking to Warren, and Detective Benton who walked up the stairs to determine if sex trafficking was occurring in Room 143. Agent Hawsey was located on the outside perimeter of the Motel 6. Furthermore, a "few minutes" into Detective Metrejean's questioning, other uniformed officers in at least one marked police car arrived. These two uniformed officers then arrived to stand "next to" Detective Metrejean while he questioned Warren. But the number of officers present is not anything like the twenty-four armed agents in Colonna or the dozen officers who searched the defendant's home in Cavazos. Certainly, the presence and conduct of the officers did not make the hotel breezeway a "police-dominated atmosphere" like the defendant's home in Craighead.

Detective Metrejean testified that Warren's demeanor was "very cooperative" and he appeared very normal during the questioning. However, the Fourth Circuit has held that a defendant's tone and demeanor goes primarily to the voluntariness of a confession as opposed to the Miranda custody inquiry. United States v. Hashime, 734 F.3d 278, 285 (4th Cir. 2013). Therefore, Warren's friendly demeanor during the questioning is not dispositive of the custodial inquiry.

Ultimately, there are more facts that weigh in favor of finding that Warren was not "in custody." At the time that Warren was questioned by Detective Metrejean—and also when Warren was questioned by Detective Benton—he was not in handcuffs or in the back of a police car. He certainly was not under arrest. Detective Metrejean —who admittedly was in a police vest with a visible firearm—was questioning Warren in the open breezeway of the Motel 6. This breezeway was not closed in and had multiple routes for Warren to leave the conversation.

The court is persuaded by Warren's mobility and lack of physical and verbal confinement during the questioning. In United States v. Durst, 138 F. Supp. 3d 741 (E.D. La. 2015), the court found that the defendant was "in custody" at the point at which FBI agents approached the defendant in a hotel lobby, identified themselves, and asked for his name and what room he checked in under. The Durst court found that "[f]rom the moment that the FBI agents identified themselves and asked [the defendant] to remain in the lobby with them," the defendant was effectively in custody for purposes of Miranda. Id. at 752. In Durst, the FBI agents had not yet informed the defendant that they had an arrest warrant for him when they first approached him. While there was no arrest warrant for Warren at the time of the questioning, here the detectives also did not inform Warren

that they were questioning him based on a tip that human trafficking was occurring at the Motel 6, and that he matched the physical description of the trafficker given in the tip. Additionally, at no point did the officers ask Warren to remain in the breezeway. This differentiates the case at hand from Durst, where the FBI agents identified themselves and asked Durst to remain in the lobby with them. Similarly, in United States v. Hernadez, 2014 WL 2980916, at *9 (W.D. Ky. July 1, 2014), the court found that a defendant was "in custody" where an FBI agent located him on the balcony outside of his hotel room, and within moments of first making contact with the defendant located and removed a loaded handgun from his front pants pocket and placed him in handcuffs. After being handcuffed, the defendant was then escorted by two more officers to a hotel room, and then escorted by two officers to another room. In contrast, here Warren was not escorted by officers at any point before his arrest, was not placed in handcuffs until his arrest, and Detective Metrejean testified that Warren was free to leave at any time.

Of course, courts have found that even when defendants were physically and verbally restrained, they were still not "in custody." For example, in United States v. Faux, 828 F.3d 130, 137 (2d Cir. 2016), the court held that a defendant was not in custody even though she "was not permitted to move freely about her home during the two-hour interrogation [and] agents accompanied her to the bathroom and to her bedroom to fetch a sweater." Similarly, in United States v. Badmus, 325 F.3d 133, 139 (2d Cir. 2003), the court held that a defendant who was "asked to stay seated in the living room and not allowed to move freely about the apartment" was not in custody. But here, where Warren was not told by the detectives that he would be accompanied if he moved about

the hotel like in Faux or asked to stay in the breezeway during questioning like in Badmus, the court is even more convinced that Warren was not "in custody."

Ultimately, at no point when he was questioned by Detectives Metrejean and Benton was Warren handcuffed, physically or verbally restrained, or otherwise confined. Based on the totality of the circumstances, the court finds that an interrogation under such circumstances would lead a reasonable person to believe that he was "at liberty to terminate the interrogation and leave." J.D.B. v. North Carolina, 564 U.S. 261, 270 (U.S. 2011). Thus, the court finds that Warren was not subject to "custodial interrogation" within the meaning of Miranda, and so his questioning falls outside the purview of Miranda's protections. The court denies Warren's motion to suppress.

## III. CONCLUSION

For the reasons set forth above, the court **DENIES** Warren's motion to suppress.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**November 13, 2017
Charleston, South Carolina**